Timothy **HAYES, M.D., et al., Plaintiffs,**

v.

**Tom RIDGE, et al., Defendants.**

**Civil Action No. 96–CV–4941.**

United States District Court,
E.D. Pennsylvania.

Nov. 6, 1996.

---

Daniel M. Gray, Swick and Shapiro, Washington, DC, for Timothy Hayes, M.D., Arthur N. Barnaby, M.D., William D. Smith, M.D., Gregory J. Lynch, D.O., Ted S. Eisenberg, D.O., Arthur J. Martella, M.D., Robert Driscoll, D.O., George Isajiw, M.D., Eric J. Carlson, M.D., Charles H. Schaefer, M.D., V.S. Shamkar, M.D., Francis C. Collins, D.O., John Salahub, D.P.M., Alphonse Di Giovanni, M.D., Michael L. Schorr, D.O., Ellen A. Mahony, Carl F. Simons, M.D., Louis A. Meir, M.D., Bruce Ganey, D.P.M., Arthur Olshum, M.D., John La Manna, M.D., Herbert G. Wendelken, D.O., John D. Jaffee, M.D., Rebecca Choitz, C.P.M., Ronald A. Leonard, M.D., Ernest M. Gordon, M.D., Gary D.A. Lewis, D.O., Walter J. Adamek, Jr., D.O., Marc B. Osias, M.D., Dennis Braun, M.D., Desmond J. Reilly, M.D., Andrew J. Szebenyi, M.D., Gilma Ramirez, M.D., Roy Stoller, M.D., Joel Loeb, M.D., Joseph M. McGuckin, M.D., F.A.C.S., Rashidia K. Kanchwala, M.D.P.C., Marcel A. Thonet, M.D., Carl F. Schultheis, Jr., M.D., Nicholas R. Pagliei, D.O., Natu R. Patel, M.D., Jack Spivack, M.D., Bruce A. Lief, M.D., Pierre Y. Ghayad, M.D., Michael D. Stulpin, M.D., John D. Jaffe, M.D., Thomas C. Peff, M.D., Maureen Brennan–Weaver, D.P.M., Joseph Rabson, M.D., Jay R. Weiskopf, M.D., Joseph Y, M.D., James McCord, M.D., Donald Armento, M.D., Alberto Larrieu, M.D., James D. Banmiller, M.D., Emely Karandy, D.O., Robert Greenhalgh, M.D., Robert Allon, M.D., Francis Carlson, M.D., Francis G. Y, M.D., John J. Y, M.D., Gary W. Muller, M.D., Ruben I. Ash, M.D., Paul H. Noble, M.D., Carl W. Sharer, D.O.

Guy A. Donatelli, William H. Lamb, Lamb, Windle & McErlane, P.C., West Chester, PA, for Tom Ridge, in his official capacity as Governor of the Commonwealth of Pennsylvania, Nicolette Parisi, in her putative official capacity as Inspector General in the Executive Office of Tom Ridge Governor of the Commonwealth of Pennsylvania, John H. Reed, in his official capacity as Director of the Medical Professional Liability Catastrophe Loss Fund of the Commonwealth of Pennsylvania, Linda Kaiser, in her official capacity as Insurance Commissioner of the Commonwealth of Pennsylvania.

William H. Lamb, Lamb, Windle & McErlane, P.C., West Chester, PA, for Yvette Kane, in her official capacity as Secretary of State of the Commonwealth of Pennsylvania, Cynthia Warner, in her official capacity as Administrator of the State Board of Medicine of the Commonwealth of Pennsylvania, Nathaniel Alston, P.A., Charles J. Bannon, M.D., Kathleen Galop, Esq., Oliver Morris Johnson, Esq., Daniel B. Kimball, Jr., M.D., Solomon C. Luo, M.D., Sant Ram, M.D., Richard E. Wright, M.D., in their official capacities as the members of the State Board of Medicine of the Commonwealth of Pennsylvania, Jack D. Albert, Daniel D. Dowd, Jr., D.O., Silvia M. Ferretti, D.O., Morris A. Fishman, D.O., Kathleen Galop, Esq., Dennis M. Guest, D.O., William R. Henwood, D.O., John L. Johnston, D.O., George M. Kern, Quentin C. Weaver, in their official capacities as Members of the State Board of Osteopathic Medicine of the Commonwealth of Pennsylvania, Dorthy Childress, in her official capacity as Administrator of the State Board of Podiatry of the Commonwealth of Pennsylvania, Stanley Bock, D.P.M., Judy Carrhart, M.D., Michael Cibik, Esq., Barbara Davis–Kenyon, D.P.M., Jack Rubinlicht, D.P.M., Maria Wynder, D.P.M., in their official capacities as Members of the State Board of Podiatry of the Commonwealth of Pennsylvania.

## MEMORANDUM AND ORDER

YOHN, District Judge.

Plaintiffs are sixty-six physicians licensed to practice medicine in Pennsylvania. The defendants are the Governor, the Director of the Medical Professional Liability Catastrophe Loss Fund, ("the CAT Fund"), the Inspector General, the Insurance Commissioner, the Secretary of State of Pennsylvania, and members of the State Boards of Medicine, Osteopathic Medicine, and Podiatry.

Nineteen of the plaintiffs have requested a preliminary injunction against the CAT Fund officials and the three licensing boards to restrain the boards from taking any further steps to suspend plaintiffs' licenses because of non-payment of the 1995 emergency surcharge for medical malpractice insurance in

excess of their basic coverage insurance under 40 P.S. § 1301.701 ("the Act"). Defendants have opposed the plaintiffs' request for a preliminary injunction.[1] The motion for a preliminary injunction will be denied.

## I. *PROCEDURAL HISTORY*

In December, 1995, plaintiffs filed suit in the Commonwealth Court and requested that the court issue a preliminary injunction restraining the state's medical boards from continuing to take any steps to suspend the plaintiffs' licenses because of the plaintiffs' non-payment of their emergency surcharges. The Commonwealth Court denied plaintiffs' application because plaintiffs had failed to add as parties some of the government officials and/or boards essential to their requested relief. The court also determined that the plaintiffs had not proven all four required elements of a preliminary injunction. *See Gueson v. Reed,* 679 A.2d 284, 285 (Pa. Commw.1996).[2]

On May 8, 1996, plaintiffs filed in Commonwealth Court a "Third Amended Complaint in the Form of Third Amended Petition for Review Seeking Injunctive, Declaratory, and Other Relief", which included the following counts: Count I stated that "Participation in the CAT Fund is Voluntary, Not Mandatory." Count II claimed "Breach of Fiduciary and Statutory Duties/Abuse of Agency Discretion/Negligence, Request for Injunctive, Declaratory, and Mandamus Relief."

Count III alleged "Violations of Due Process Under Administrative Agency Law and the Pennsylvania Constitution." Count IV alleged "Section 1983 Claims Against respondents in Their Official Capacities." *Gueson v. Reed,* 679 A.2d 284 (Pa.Commw.1996).

Subsequent to the filing of that amended complaint, plaintiffs again requested that the Commonwealth Court issue a preliminary injunction. Specifically, the second request sought to:

1. Preliminarily enjoin Director of the CAT Fund and the Insurance Commissioner from certifying those Petitioners not yet certified for alleged failure to comply with the Health Care Services Malpractice Act ("the Act") to the respective State Boards for suspension or revocation of their license to practice medicine, osteopathy or podiatry; and

2. Preliminarily enjoin the respective State Boards and the Department of State's Bureau of Professional and Occupational Affairs from taking any steps to suspend, revoke or otherwise impair Petitioners' licenses until such time as [court] makes a final determination on the merits.

*Gueson v. Reed,* 679 A.2d at 287.

The Commonwealth Court denied the plaintiffs' second request for a preliminary injunction finding that the plaintiffs had again failed to satisfy the criteria necessary for the grant of a preliminary injunction.[3]

---

1. Defendants have also filed a motion to dismiss arguing that plaintiffs have failed to state any claims upon which relief can be granted.

2. Neither of the parties provided a copy of the state court complaint or the applications for preliminary injunction. Therefore, this information has been gleaned from the Commonwealth Court's opinion denying the plaintiffs' second request for a preliminary injunction. *See Gueson v. Reed,* 679 A.2d 284 (Pa.Commw.1996).

3. The Commonwealth Court stated:

With regard to ... "immediate and irreparable harm" ..., I found that Petitioners presented no evidence that anybody's license had been suspended, that anybody's license was being threatened, that there were any suspension proceedings before any of the boards.... Concerning whether greater injury would result by granting the requested

relief, I found that any injury to the 551 claimants with favorable final judgments or settlements in medical malpractice actions who have been awaiting payment of their claims had to be weighed more heavily than any potential injury to health care providers having difficulty paying their CAT Fund surcharges. With regard to the status quo criterion, I noted that many health care providers had already paid their emergency surcharges. I accepted ... Reed's testimony that $104 million dollars out of $107 million dollars worth of the emergency surcharge had already been submitted. Finally, I found that Petitioners failed to prove a clear right to relief in that they failed to request specific relief. To the extent that they did in the form of requesting that I enjoin the disbursement to claimants or enjoin further billing of health care providers, I concluded that there was no clear right to that relief.

On July 12, 1996, immediately after the Commonwealth Court denied the plaintiffs' request for a preliminary injunction, plaintiffs filed a wide-ranging complaint in this court alleging multiple violations of due process and equal protection under the Fourteenth Amendment to the U.S. Constitution by the CAT Fund. The complaint states (1) that plaintiffs have no prior notice through administrative rule-making procedures that failure to pay the CAT Fund surcharges is an offense punishable by license suspension or revocation, and (2) that plaintiffs have no real hearing/opportunity[4] to argue about (a) their status as CAT Fund participants (they claim participation is voluntary, not mandatory), (b) the surcharge amount determination, (c) the certification by the CAT Fund to the state boards, or (d) justifiable nonpayment due to financial hardship, and (3) that the "unfettered discretion" of the Director of the Fund to investigate, accelerate, settle, terminate, etc., claims against the Fund violates their substantive due process rights, as does requiring their participation in the Fund (because they should be allowed to obtain private insurance).

Further, plaintiffs claim that the Fund administration violates the Equal Protection Clause, because self-insured hospitals have not been contributing their pro rata share, as required by § 1301.701(e)(2). Further, plaintiffs raise due process claims under the Pennsylvania Constitution and the state's administrative agency law.

Plaintiffs also present claims for breach of statutory and fiduciary duties, abuse of agency discretion, and negligence against the Director of the Fund and the Insurance Commissioner. Plaintiffs contend that the Director failed to promulgate clear standards as to participant status, the procedures for investigation, settlement, and termination of claims, the validity of surcharges, and procedures for notice and opportunity for a hearing. The Director also allegedly breached his duties to plaintiffs by failing to prudently manage the Fund in terms of payment of claims and administrative expenses. He also allegedly failed to correct the known mismanagement of his predecessors. Plaintiffs contend that the Insurance Commissioner failed to regulate and license the CAT fund as state statutes require with regard to excess insurers, and approved surcharges without investigating the operations of the Fund.

Finally, plaintiffs invoke the Constitution's "guarantee of a republican form of government" clause and present a charge of conspiracy to deny civil rights under 42 U.S.C. § 1985(3).

Plaintiffs request injunctive relief to prevent further certifications and further suspension hearings because of plaintiffs' failure to pay the emergency surcharges. As provisional relief, plaintiffs ask for a preliminary injunction[5]

(1) prohibiting Defendant John H. Reed, Director of the Medical Professional Liability Catastrophe Loss Fund of the Commonwealth of Pennsylvania ("CAT Fund") from certifying Plaintiff health care providers to the Defendant State Licensing Boards for license suspension or revocation proceedings on grounds of alleged or actual non-payment of CAT Fund surcharges until this Court can decide this case on the merits; and

(2) prohibiting Defendant State Licensing Boards from proceeding with license suspension or revocation hearings against nineteen (19) of the Plaintiffs on grounds of alleged non-payment of CAT Fund surcharges....[6]

*Gueson v. Reed*, 679 A.2d at 286.

4. Plaintiffs contend that the post-certification hearings before the state boards are a "sham," because the boards "must suspend or revoke professional licenses once certification has occurred." Plaintiffs' Complaint at ¶ 83.

5. As to plaintiffs Emerita Gueson, M.D. and Alphonse DiGiovanni, M.D., plaintiffs requested a temporary restraining order rather than a pre-

liminary injunction. See Plaintiffs' Supplemental Brief in Support of Application for Preliminary Injunction at p. 2. That motion for a temporary restraining order has already been denied.

6. In addition to the request for an injunction, the plaintiffs request the following permanent relief: 1) the court declare participation in the CAT Fund to be voluntary; 2) the court issue an order

Plaintiffs' Application for Preliminary Injunction, p. 1.

The grounds for the preliminary injunction are that the Act "violates both procedural and substantive due process under the Fourteenth Amendment in (1) failing to give reasonable notice and opportunity for a hearing at key points in the CAT Fund administrative process; and (2) operating in an arbitrary and capricious fashion with respect to investigation, evaluation, settlement or termination of claims against the CAT Fund, determination of CAT Fund surcharges, levy of those surcharges, collection of those surcharges, and commencement of disciplinary proceedings against health care providers for alleged or actual non-payment of CAT Fund surcharges." Plaintiffs' Application for Preliminary Injunction, p. 2.

On August 29, 1996, the court held a hearing on the plaintiffs' preliminary injunction request. The parties submitted proposed findings of fact and conclusions of law through October 14, 1996 and the matter is now ripe for disposition.

## II. *FACTS*[7]

Plaintiffs Allon, Armento, Ash, Banmiller, Brennan–Weaver, DiGiovanni, Greenhalgh, Gueson, Isajiw, Karandy, Kutney, Lariiew, Lynch, Mahoney, McGuckin, Meier, Muller,

Noble and Sharer ("plaintiffs") are all "health care providers" required to pay the 1995 emergency surcharge under the provisions of the Health Care Services Malpractice Act ("the Act"). *See* 40 P.S. § 1301.701(f).

At a scheduling conference on October 24, 1996, plaintiffs' counsel advised the court that none of the nineteen plaintiffs seeking a preliminary injunction has yet received a decision from a hearing examiner suspending or revoking his or her license. As a result, none has yet received a hearing before the licensing board or a decision from the licensing board.[8]

At the August 29, 1996 hearing, the plaintiffs and defendants agreed that a license suspension would affect the plaintiffs' staff privileges at hospitals and their relationship with third-party payers who insure their patients, including HMO's and indemnity carriers. In addition, several physicians testified that they felt that a suspension would harm their reputation in the community because patients would not know the basis for it. (N.T. 8/29/96, p. 77). The following testimony provides more insight into the potential effect of the physicians' suspensions.

Plaintiff Ellen Mahony, M.D., is a hand and plastic surgeon licensed by the Board of Medicine whose 1995 emergency surcharge was $7,400. Her regular surcharge for 1995

requiring CAT Fund compliance with the malpractice act, an order requiring defendants to clarify and define legal standards, a mandamus requiring defendants to recover misspent CAT Fund money, and an accounting. See Plaintiffs' Complaint ¶ 187.

7. These facts were derived from the August 29, 1996 hearing before the court at which seven physicians and John Reed, Director of the CAT Fund, testified. In addition, the following documents were admitted into evidence by stipulation and constitute part of the record:

1) December 21, 1995 transcript before Commonwealth Court (Complaint Exhibit 6);
2) June 27, 1996 transcript before the Commonwealth Court;
3) Complaint Exhibit 1–Notice of Hearing Letters from BPOA;
4) Complaint Exhibit 3–Executive Order of Governor's Office;
5) Complaint Exhibit 7–Reed's Testimony before Senate Banking Committee;
6) Complaint Exhibit 8–Kaiser's Testimony on Proposed Senate Bill 1122;

7) Complaint Exhibit 10–Inspector General's Motion to Quash;
8) Complaint Exhibit 11–Commonwealth Court's Opinion on 1st Injunction Request;
9) Complaint Exhibit 12–BPOA & CAT Fund letters to Plaintiffs (except last 4 pgs);
10) Complaint Exhibit 14–Chavaria Adjudication (Incomplete);
11) Complaint Exhibit 15–Letter from Reed to Chairman Micozzie.

In addition, the court takes judicial notice of the Memorandum and Order regarding plaintiff Hayes issued by the State Board of Medicine on September 12, 1996. Plaintiffs made this request and defendants have not objected.

8. One plaintiff, Dr. Hayes, has been suspended by a hearing examiner for failure to pay his surcharge on May 21, 1996. Plaintiffs' Complaint Exhibit 14. Hayes has appealed his suspension seeking review from the full Board of Medicine. Hayes is not one of the nineteen plaintiffs now seeking a preliminary injunction but only one of the sixty-six plaintiffs named in the complaint.

was $27,000 and for 1996 is $32,000. After net income losses of $41,000 in 1992, $13,000 in 1993, $17,000 in 1994 and a $5,000 profit in 1995. (N.T. 8/29/96, p. 36, 40). Dr. Mahony has closed her private practice. She is now employed for another plastic surgeon who pays her approximately $1,000 per month. Dr. Mahony also works as a doctor at a steel firm in Reading for which she is paid $60 per hour. (N.T. 8/29/96, p. 61, 65–66).

Dr. Mahony stated that she is required to have insurance coverage for staff privileges at her hospitals and is required to advise the hospitals if her license is suspended or revoked. Further, she is required to advise other states to which she may apply for licensure whether she has been previously suspended. (N.T. 8/29/96, p. 35).

Plaintiff Emely Karandy, M.D., is a plastic and reconstructive surgeon licensed by the Board of Osteopathic Medicine. She testified that she could not afford to pay the 1995 emergency surcharge of $5,300; her 1995 Schedule C net income was only $12,000. (N.T. 8/29/96, p. 82). Dr. Karandy tried unsuccessfully to obtain financing for the emergency surcharge. (N.T. 8/29/96, p. 80–81).

Dr. Karandy receives child support of $2,000 per month from her husband and alimony of $3,000 per month, down from $4,000 per month. (N.T. 8/29/96, p. 82). She is presently working as a part-time physician at the Presbyterian Hospital of the University of Pennsylvania. She is also on staff at Graduate Hospital in Philadelphia. She lost sixty percent (60%) of her pre–1993 income due to the loss of her position as co-director of medical training at Cooper Hospital. To supplement her income, Dr. Karandy sought retraining in emergency and occupational medicine and worked as a doctor at a steel mill in Reading. (N.T. 8/29/96, p. 72–73).

Dr. Karandy testified that should a hearing examiner suspend her license, the suspension would harm her reputation. Of particular concern to Dr. Karandy was the fact that the public would not know exactly for what she had been disciplined. She feared being "stigmatized." (N.T. 8/29/96, p. 77).

Plaintiff Francis Kutney, M.D., is a general surgeon and an industrial surgeon who worked part-time for Boeing Helicopter in Essington, Delaware County for twenty-seven years (27) ending in 1993. (N.T. 8/29/96, p. 141). Dr. Kutney could not afford to pay the 1995 emergency surcharge of approximately $7,000 because he sustained losses of approximately $15,000 to $20,000 for both 1994 and 1995. Currently, Dr. Kutney is employed with an older physician who needs assistance in maintaining his offices. The other physician is financing Dr. Kutney's 1996 insurance charges of $28,000. (N.T. 8/29/96, p. 145–6). Dr. Kutney plans to close down his own private office soon. (N.T. 8/29/96, p. 145–6).

Plaintiff Robert Greenhalgh, M.D., is a licensed family practitioner who practices in Luzerne County. His net income for 1994 was $24,000 which will "go up slightly" during 1995. (N.T. 8/29/96, p. 157).

Dr. Greenhalgh did not pay the emergency surcharge for 1995 because he saw an inconsistency between the mandatory language for basic coverage insurance and the possibly voluntary language of the CAT Fund statute. (N.T. 8/29/96, p. 158–9). Should his license be suspended, Dr. Greenhalgh's staff privileges at three hospitals in the Wilkes–Barre area would be endangered. Further, forty percent (40%) of his practice, that which is now based upon HMO contracts, potentially would be terminated. (N.T. 8/29/96, p. 161–63).

Dr. Greenhalgh's wife is a gynecologist whose net income in 1994 was $34,000. He has approximately $5,000–$6,000, two months income, currently in the bank. (N.T. 8/29/96, p. 154–5).

Plaintiff Joseph McGuckin, M.D., is an orthopedic surgeon on staff at Holy Redeemer Hospital who failed to pay the 1995 emergency surcharge. He paid almost $33,000 in professional liability insurance charges in 1995; his regular surcharge for 1996 was $44,000. (N.T. 8/29/96, p. 105–6). Because of these fees, Dr. McGuckin stated that he did not have the money to pay the emergency surcharge of $10,946. Dr. McGuckin also stated that he gave up his surgical practice because he could no longer afford the malpractice premiums for surgery. (N.T. 8/29/96, p. 110). He presumes that a suspen-

sion of his license would harm his remaining office practice. (N.T. 8/29/96, p. 111).

Plaintiff Gary Muller, M.D. is a licensed orthopedic surgeon. Dr. Muller has staff privileges at Northeast Philadelphia Hospital, Jeanes Hospital, Holy Redeemer Hospital and Rolling Hill Hospital.

Dr. Muller testified that he did not pay the 1995 $21,500 emergency surcharge because he could not afford it, although he admitted that if he had to, he could pay the emergency surcharge. (N.T. 8/29/96, p. 131) [9]. Muller had a 1995 professional liability insurance bill of $60,000 which he paid immediately before he was billed $21,500 for the 1995 emergency surcharge. (N.T. 8/29/96, p. 121–21). His 1995 gross income was $600,000; his net income was $280,000.

A suspension of Dr. Muller's license likely would harm his practice. He stated that he "would lose any of that surgery or any office visits, as well as, you know, losing staff privileges and, you know, any referral base." (N.T. p. 8/29/96 p. 126). Because one-half of his patient base are managed care subscribers, if he were suspended he would have to notify their insurance carriers as well. (N.T. p. 8/29/96 p. 126).

Plaintiff Carl Sharer, M.D., is a licensed oncologist. He has staff privileges at Montgomery and Suburban Hospitals.

Dr. Sharer stated that he was unable to pay the 1995 emergency surcharge because notice came late in the year and despite his $92,000 salary, "income was tight at the end of the year." (N.T. 8/29/96 p. 87). His emergency surcharge was $2,107. (N.T. 8/29/96 p. 88).

Dr. Sharer has now paid the emergency surcharge although he has not advised the CAT Fund of this fact. Therefore, he remains subject to suspension proceedings. (N.T. 8/29/96, p. 86–87). Dr. Sharer testified that any suspension would require him to report it to hospitals and managed care organizations, an event which could negatively impact on his patient base. (N.T. 8/29/96, p. 89).

Defendant John Reed is the Director of the CAT Fund. On September 20, 1995, he testified before the Banking and Insurance Committee of the Pennsylvania Senate in order to explain the basis of the 1995 emergency surcharge later assessed against Commonwealth health care providers on November 1, 1995. (Plaintiffs' Complaint, Exhibit 7).

Reed testified that when he arrived at the CAT Fund on July 3, 1995, he "discovered a system in disarray, swamped by a flood of new lawsuits" which the CAT Fund staff "had not yet even been able to begin processing, much less subject to meaningful evaluations." (Plaintiffs' Complaint, Exhibit 7 p. 2). Reed advised the committee that his predecessors had established a plan "to stall settlements" of malpractice claims in an "attempt to avoid an emergency surcharge." (Plaintiffs' Complaint, Exhibit 7 p. 2). Reed also testified that under his predecessors, the CAT Fund had "cases going to trial with no defense experts, no primary tenders, erroneous information, and no expectation of a valid defense to the claims." (Plaintiffs' Complaint, Exhibit 7 p. 3).

At the December 21, 1995 hearing before the Commonwealth Court, Reed testified that the CAT Fund would "oftentimes encounter cases coming to us where no defense had been prepared by the insurance company involved. We would do the best we could under the circumstances with those cases once we became aware of them." (N.T. 12/21/95, p. 91). Reed further stated that insurance companies' failure to investigate the basis of claims made against the CAT Fund "made it difficult for the Fund because the insurance companies weren't doing their job. The Fund did its job, and it had no relationship to what we actually settled." (N.T. 12/21/95, p. 91). Reed also testified to an extreme backlog of unsettled cases. (N.T. 12/21/95, p. 91).

When he became Director on July 3, 1995, Reed decided to try to remedy the problems with the CAT Fund. In order to end the

---

**9.** Similarly, Dr. Lynch testified before the Commonwealth Court that the reason he did not pay his surcharge was because he "felt it was an attack on the private practice of medicine." (N.T. 6/27/96 p. 55).

backlog of unsettled cases, and to recognize "present value" financial savings, he settled cases sooner rather than later. (N.T. 12/21/95, p. 93–4). Because of this decision, the CAT Fund experienced a deficit of approximately $107 million ($8 million inherited, $99 million because of increased settlements) in 1995 which engendered the need for an emergency surcharge. (N.T. 8/29/96, p. 194).

Reed stated that if a physician does not pay the emergency surcharge, that physician's claims for that year will not be covered by the CAT Fund. Reed also stated that the effect of the court's issuing an injunction would be to create a chaotic situation because it would signal to other doctors that they too did not have to pay their emergency surcharge. This ripple effect would drain the CAT Fund's resources and prevent those injured by physician malpractice from receiving proper compensation. (N.T. 8/29/96, p. 174–5).

Finally, Reed confirmed that there is no hearing before the CAT Fund officials certify that a doctor has not paid the emergency surcharge. Reed also testified that his counsel, John Alcorn, had advised him that participation in the CAT Fund was mandatory for all physicians. (N.T. 8/29/96, p. 193).

John F. Alcorn, Senior Counsel of the Bureau of Professional and Occupational Affairs ("the BPOA"), testified before the Commonwealth Court as "the most knowledgeable person ... with regard to the procedures and regulations of the Defendant licensing boards." (N.T. 6/27/96, p. 120.). At the June 27, 1996 hearing, Alcorn provided the Commonwealth Court with a brief summary of the agency structure involved. He testified that the BPOA provides "administrative support to the licensing boards, from the actual handling and processing of applications through providing to the boards other administrative staff, including staff to prosecute cases and also staff to counsel and advise

them ..., [and] hearing examiners to hear cases in the first instance." (N.T. 6/27/96, p. 120). Alcorn then described the sequence of events from certification to suspension.

Alcorn testified that pursuant to the Act, CAT Fund Director Reed "certifies" any physician who has not paid their emergency surcharge. That certification file is ultimately referred to a prosecuting attorney in the prosecution division of the BPOA who then, along with the CAT Fund, sends a letter to the delinquent physician advising him or her that the physician is not in compliance with the Act. That informal notice provides the physician with an opportunity to cure the noncompliance by payment within 20 days. (N.T. 8/29/96 p. 137). After that notice is sent, and so long as no payment is received, the prosecuting attorney has discretion to decide whether to proceed with formal proceedings by filing an order to show cause. The order to show cause includes a statement of the seriousness of the charges and the particular violations of the law. The physician has 20 days to respond to the order to show cause; in responding, the physician can *inter alia* pay the surcharge, file a written answer and request a BPOA hearing. (N.T. 6/27/96, p. 120–124).

In this regard, the parties stipulated that the physicians are sent a letter from the CAT Fund and a letter from the BPOA demanding payment of the emergency surcharge. If the emergency surcharge is paid after receiving either of these letters, no further proceedings ensue. However, if no payment is received, the BPOA sends an order to show cause to the physician. If the physician pays the emergency surcharge after receiving that document, he or she may still be subject to a suspension hearing. (N.T. 8/29/96 p. 139).[10]

The hearing takes place in front of a BPOA hearing examiner where the prosecuting attorney must establish a violation of the

---

**10.** Immediately before this stipulation, plaintiff Suresh Ghosh, M.D., who is not one of the plaintiffs seeking a preliminary injunction, began to testify that he was the subject of a two week suspension even though he paid his surcharge before the hearing. (N.T. 8/29/96 p. 135). Defendants objected to the testimony because the doctor was not listed as a plaintiff and because "the fact that a particular action may have been taken with respect to this individual doesn't dictate what may happen to other people." (N.T. 8/29/96 p. 139). The above stipulation was a result of this objection.

Act and where there is the "opportunity for presentation of evidence with regard to mitigation and/or aggravation of sanction." (N.T. 6/27/96, p. 124). As Alcorn stated: "The responding health care practitioner is provided an opportunity to challenge both the violation of the law as well as to present mitigation evidence with regard to sanction." (N.T. 6/27/96, p. 124).

Once the hearing examiner has issued a decision and a sanction, the physician has 20 days in which to file an application for review to either the State Board of Medicine or the State Board of Osteopathic Medicine or the State Board of Podiatry. At the review hearing, the physician may present new additional evidence. If the physician is unhappy with this review, and with the BPOA's final determination, then the physician may appeal the decision to the Commonwealth Court within 30 days. (N.T. 6/27/96, p. 128–130).

The following additional facts were brought out during the testimony of Alcorn: 1) The prosecuting attorney and the adjudicator (the hearing examiner) are both in the same agency, the BPOA. (N.T. 6/27/96, p. 133); 2) There are no agency guidelines which a prosecutor must follow when deciding whether to prosecute a case once the file has been transferred to the individual prosecutor (N.T. 6/27/96, p. 135); 3) To the extent the hearing examiner or the board find that a health care provider has failed to pay the surcharge, regardless of the reason, a violation of the Act exists and, according to Mr. Alcorn, "1301. § 701(f) calls for suspension or revocation of licenses." (N.T. 6/27/96, p. 141); 4) If the board determines that a physician's failure to pay was due to inability to pay, such evidence could mitigate the punishment and decrease the suspension's severity. (N.T. 6/27/96, p. 144–45).

Plaintiffs concede that suspensions are only effective after a hearing examiner makes a decision, and that if a physician appeals his suspension, he can freely practice until the board has held its hearing and rendered a decision. (N.T. 8/29/96, p. 16–20).

### III. CONCLUSIONS OF LAW

■ Considering the procedural history and facts of this case, especially the fact that the plaintiffs' suit was brought in federal court immediately after the plaintiffs were denied the same request in state court, defendants contend that the prior Commonwealth Court decision has a preclusive effect as to the pending motion for a preliminary injunction. Defendants phrase their argument as either res judicata (claim preclusion) or collateral estoppel (issue preclusion). Whichever principle of preclusion applies,[11] because the judgment under consideration was of a state court, Pennsylvania's law of preclusion must govern. *See, e.g., Gregory v. Chehi,* 843 F.2d 111, 116 (3d Cir.1988) ("A federal court applying preclusion principles is bound by the Full Faith and Credit statute, 28 U.S.C. § 1738, and must give a prior state judgment the same effect as would the adjudicating state." (footnote omitted)).

■ For issue preclusion, Pennsylvania requires that "1) the issue decided in the prior case must be identical to the issue in the present case; 2) there was a final judgment on the merits; 3) the issue must be essential to the judgment; 4) the party against whom estoppel is asserted must have had a full and fair chance to litigate on the merits; and 5) the party against whom estoppel is asserted must be a party or in privity with a party in the prior case." *Farley v. Zoning Hearing Bd.,* 636 A.2d 1232, 1237 (Pa.Commw.1994) (quoting *City of Pittsburgh v. Zoning Bd. of Adjustment,* 522 Pa. 44, 559 A.2d 896 (1989)), *appeal denied,* 539 Pa. 658, 651 A.2d 544 (1994).

■ The only disputed issue regards the nature of a preliminary injunction ruling. As the plaintiffs note, a preliminary injunction ruling is typically of no preclusive effect because it is not a judgment on the merits and "by definition it is a temporary remedy granted until that time when the party's [sic] dispute can be completely resolved." *In re Appeal of Little Britain,* 651 A.2d 606, 611 (Pa.Commw.1994), *appeal denied,* 541 Pa.

**11.** Given the limited nature of a preliminary injunction ruling, collateral estoppel (issue preclusion) seems the more appropriate doctrine. In addition, the other cases that have addressed the issue have discussed the issue in terms of collateral estoppel.

645, 663 A.2d 696 (1995). The cases cited by plaintiffs, and most of the cases on the subject of the preclusive effect of preliminary injunction rulings, involve an attempt to use a prior preliminary injunction ruling to determine a final substantive point in either the same case or in another case. Here, however, defendants argue only that the prior preliminary injunction ruling should have preclusive effect as to a subsequent preliminary injunction proceeding. Defendants are not arguing that the prior preliminary injunction ruling should have any preclusive effect on consideration of the merits of the case at the final hearing.

Very few cases, from either federal or Pennsylvania courts, have even mentioned this issue. Defendants point to *Farley*, 636 A.2d at 1237, in which the Commonwealth Court held that a federal court decision denying a motion for preliminary injunction collaterally estopped plaintiffs from pursuing similar claims in state court. The *Farley* decision is less helpful than it appears, because the federal court, in the same ruling denying the motion for a preliminary injunction, granted defendants' motion for summary judgment. *Id.* at 1235. The *Farley* court specifically noted that the plaintiffs in the federal action "had full and fair opportunity to litigate the [precluded] issues on the merits; and their disposition was essential to the district court's final judgment that [the plaintiffs] were not entitled to a preliminary injunction or a temporary restraining order." *Id.* at 1237. The court then held that "the doctrine of collateral estoppel bars the challenges [of the unsuccessful federal plaintiffs]." *Id.* at 1237. The court found plaintiffs' claims barred completely, not just as they related to a motion for preliminary injunction. Given the limited nature of a preliminary injunction ruling, the state court's

decision probably hinges upon the fact that the earlier federal ruling also involved consideration and granting of a motion for summary judgment.[12]

Three federal cases—useful because the standard for collateral estoppel appears universal—support the proposition that a preliminary injunction ruling has preclusive effect with regard to subsequent motions for preliminary injunction. First, in *Lyon Ford, Inc. v. Ford Marketing Corp.*, 337 F.Supp. 691 (E.D.N.Y.1971), the court faced a motion for preliminary injunction based on the same facts as a prior preliminary injunction motion that had been denied. The court noted:

> In considering the right to a preliminary injunction, the plaintiff would have the court disregard all the proceedings in 71–C–347 [a companion case] where a preliminary injunction was denied. This contention disregards the present New York rule of collateral estoppel, which forbids a party from litigating an issue a second time if it has been decided in a prior action where there was a full and fair opportunity to contest the matter.... Plaintiff had a full and fair opportunity to present the facts in the hearings on a preliminary injunction in 71–C–347. No new facts have been shown here.

*Id.* at 695. In *Walsh v. International Longshoremen's Ass'n*, 488 F.Supp. 524 (D.Mass.), *judgment vacated on other grounds by*, 630 F.2d 864 (1st Cir.1980), the court, distinguishing a typical motion for a preliminary injunction from one under § 10(1) of the National Labor Relations Act, stated that it was not "suggest[ing] that a decision on traditional preliminary injunctive relief will not bind a second court faced with the same request by the same party based on identical issues." *Id.* at 528 n. 2 (citing *Lyon Ford* ).[13]

**12.** Plaintiffs suggest that *Farley* is completely inapplicable because the case required a state court to determine the preclusive effect of a federal court's preliminary injunction ruling and that *Farley*, therefore, has no relevance for a federal court laboring under the mandate of the full faith and credit statute, 28 U.S.C. § 1738. This argument lacks merit.

The full faith and credit statute requires a federal court to give the same effect to a state court ruling as a state court would. In this case,

the statute requires examination of Pennsylvania principles of collateral estoppel. The *Farley* court cited Pennsylvania law of collateral estoppel and decided that its requirements were met; the decision was *not* based on the fact that the prior judgment was issued by a federal court, so there is no reason to suppose that the decision would not have been the same had the prior ruling issued from a state court.

**13.** The significance of the language in *Walsh* is obviously very limited; it is not the holding, but

Finally, and more recently, in *Dairymen, Inc. v. Federal Trade Comm'n,* 1981 WL 2140 (W.D.Ky.1981), the court considered a second preliminary injunction request where the first had been denied by another court within the same district. The court noted:

[I]t appears that considerations of collateral estoppel are applicable.... It is clear that the issue of significance [in the first action] was whether this court has the authority to halt agency proceedings prior to final action on the basis of a contested claim of lack of jurisdiction to proceed.... That issue [lack of probability of success on the merits] was decided adverse to plaintiff. While the posture of the administrative action may have changed slightly since the entry of that opinion, all operative facts remain the same. We are of the opinion that principles of collateral estoppel bar the present action, and it must be dismissed.

*Id.* at *1–2.

In addition, Wright, Miller, & Cooper, in their treatise on federal practice and procedure, support and cite favorably the above cases:

[I]nterlocutory injunction rulings commonly lack preclusive effect in other proceedings. All that has been decided is whether preliminary relief is warranted in light of educated guesses as to the outcome on the merits and the balance of hardships. Even if the same matters arise again in a similar interlocutory setting, preclusion should be defeated if there is a reasonable prospect that a different preliminary showing can be made on the merits or on the balance of the hardships. *Preclusion may properly be applied, however, if the same showings are made and it appears that nothing more is involved than an effort to invoke a second discretionary balancing on the same interests.*

WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE, § 4445, at 394–95 (1996) (emphasis added) (citing *Lyon Ford* and *Dairymen* ).

■ In this case, nearly every indication favors a finding that the prior state court ruling denying plaintiffs' application for a preliminary injunction has a preclusive effect such that their identical motion in this court ought to be denied. First, the state and federal complaint and preliminary injunction motion involve the same factual and legal underpinnings. Second, the parties are virtually identical. Third, the parties had at least two full Commonwealth Court hearings on the preliminary injunction motion.[14]

Nonetheless, two potential issues remain. The first is that the Pennsylvania and federal standards for issuance of a preliminary injunction are not identical. (In other words, the "issue" in federal court is arguably different from the state court "issue".) Pennsylvania courts frequently characterize the key factors test as including: whether the plaintiff has a clear right to relief and the wrong is manifest, whether the injunction is necessary to prevent irreparable harm, whether issuing the injunction will cause greater harm than refusing to issue one, whether the public interest will be hindered or advanced, whether the injunction will re-

mere dicta stating a negative proposition. It does indicate that at least one other court found *Lyon Ford* persuasive (or, at a minimum, worthy of mention).

**14.** At the August 29, 1996 hearing, plaintiffs argued that the current suit in federal court is somehow different from prior suits in Commonwealth Court. They offered the following reasons: First, according to plaintiffs, they are now more "focused" on the federal claims because they have added an equal protection claim that self-insureds should pay their own share and a § 1985 conspiracy claim (N.T. 8/29/96, p. 6–9). Second, plaintiffs claim that now they have additional defendants, namely the Governor and the Inspector General, who were not named in the state suit. (N.T. 8/29/96, p. 6–9). Third, they

claim that they now have different plaintiffs; they point to the fact that the state court complaint lists approximately five plaintiffs who do not appear in the federal complaint and the federal complaint lists one plaintiff the state court complaint did not name.

Plaintiffs' characterizations are irrelevant. Although it is true that the plaintiffs have added both the § 1985 conspiracy claim and the equal protection claim to the federal action, and it is true that the Governor and the Inspector General are now named as defendants, with an additional plaintiff, the suit's main issues, notably the fourteenth amendment due process claims against the CAT Fund, and the parties, are exactly the same.

store the parties to their relative status prior to the alleged wrongdoing, and whether the injunction is reasonably suited to stop the wrongdoing. *See, e.g., Philadelphia v. District Council 33,* 528 Pa. 355, 598 A.2d 256, 259, 260 (1991) (citing *Singzon v. Department of Public Welfare,* 496 Pa. 8, 436 A.2d 125 (1981)); *WPNT Inc. v. Secret Communication Inc.,* 443 Pa.Super. 269, 661 A.2d 409, 410 (1995).

The Third Circuit describes the four factors a plaintiff must show in order to obtain a preliminary injunction as: the likelihood that the plaintiff will prevail on the merits at the final hearing, the irreparable harm plaintiff suffered and will suffer if the conduct complained of continues, the extent of irreparable harm the defendant will suffer if an injunction issues, and the public interest. *See, e.g., Merchant & Evans v. Roosevelt Bldg. Prods.,* 963 F.2d 628, 633 (3d Cir.1992).

The preliminary injunction standards are not identical in form or phrasing, but in substance they are very similar, such that the "issue" decided by the Commonwealth Court—whether a preliminary injunction is the proper relief under Pennsylvania state law—is essentially the same as the issue presented to this court.

■ The second issue is whether the state court denial of the injunction is a "final judgment on the merits." Like the discussion above, this does not present a significant obstacle. This is so is because a preliminary injunction *is* a final judgment on the merits (when appealed and affirmed or when not appealed) *of the limited issue presented by the preliminary injunction*—i.e., whether the plaintiffs can show likelihood of success on the merits, irreparable harm, and the other necessary factors. *See Farley,* 636 A.2d at 1237 ("[Appellants] had a full and fair opportunity to litigate these issues ... and

their disposition was essential to the district court's *final judgment* that [Appellants] were not entitled to a preliminary injunction."). Because application of the doctrine of collateral estoppel requires that the prior judgment be final and on the merits, this must also have been the reasoning underlying the decisions of the courts in *Lyon Ford,* 337 F.Supp. 691 (E.D.N.Y.1971), and *Dairymen,* 1981 WL 2140 (W.D.Ky.1981), which found the second request for a preliminary injunction to be precluded.

In addition, the obvious forum shopping, as evidenced by the identical claims, the absence of any substantial considerations not raised at the state court proceeding, and the immediate filing of the federal action following denial of the preliminary injunction in state court, further supports a finding that collateral estoppel applies. The motion for a preliminary injunction will, therefore, be denied on the basis of collateral estoppel.

■ For the sake of completeness, however, the court briefly notes that the plaintiffs in this case have also failed to meet the four essential elements required for a preliminary injunction,[15] although this does not necessarily mean they will be unable, after a final hearing, to meet the requirements for a permanent injunction.

As to the first factor, it does not appear that plaintiffs are likely to prevail on the merits of their procedural and substantive due process claims if the case were heard at this early stage of the state administrative proceedings.

Of note, until persuaded to the contrary, the court believes that the dispute as to whether the CAT Fund is voluntary or mandatory is largely one of semantics. As the statute reads,[16] all healthcare providers must participate in the basic coverage provision; those who participate in the basic coverage

---

**15.** In determining whether to grant or to deny a request for a preliminary injunction, the district court must consider the following four factors: "[A] the likelihood that the applicant will prevail on the merits at final hearing; [B] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; [C] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and [D] the public interest." *Bill Blass, Ltd. v. SAZ Corp.,* 751 F.2d 152, 154 (3d Cir.1984). Only if

the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue. *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987).

**16.** Section 701 of the Act states:
(a) Every health care provider ... *shall* insure his professional liability only with an insurer licensed or approved by the Commonwealth of Pennsylvania, or provide proof

are automatically deemed "entitled to participate" in the CAT Fund; those who are "entitled to participate" in the CAT Fund are required to pay the annual and emergency surcharges. Thus, strictly speaking, the healthcare providers may not be required to become members of the CAT Fund (they are simply entitled) but they are required to pay the surcharge. Thus, one might argue that participation is voluntary, but payment of the emergency surcharge, the crux of this case, is not.

 As to the second factor, the court believes that most of the plaintiffs have not shown sufficient irreparable harm. Of note is the fact that at least some of the plaintiffs testified that they refused to pay CAT Fund surcharges as a matter of principle.[17] Such "self-inflicted" harm cannot qualify as irreparable injury. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828 (3d Cir.1995). Further, some of the plaintiffs testified that they were unable to afford the emergency surcharge, although in fact they probably could afford it. They too do not qualify as irreparably harmed. Finally, of those who truly cannot afford to pay, it is clear that the hearing examiners and licensing boards will consider that fact and it is thus far unknown whether or not those persons will suffer any suspension or revocation at all.

Finally, as to the third and fourth factors, the court concludes that plaintiffs have not refuted the defendants' argument that if either the court or the CAT Fund waives the plaintiffs' emergency surcharge requirements, the public interest will be severely harmed; as Reed's testimony clearly demonstrates, any waiver will have a detrimental effect on the CAT Fund's ability to raise revenues and to pay those claimants who have successfully settled or litigated medical malpractice claims.

For the reasons mentioned herein, the plaintiffs' request for a preliminary injunction will be denied.

An appropriate order is attached.

### ORDER

AND NOW, this 5th day of November, 1996, after the August 29, 1996 hearing, and in consideration of plaintiffs' "Application for Preliminary Injunction and Motion for Expedited Hearing," and defendants' response thereto, it is hereby ORDERED that the motion for a preliminary injunction is DENIED.

---

of self-insurance in accordance with this section.

(a)(1)(i) A health care provider, other than hospitals, who conducts more than 50% of his health care business or practice within ... Pennsylvania *shall* insure or self-insure his professional liability in the amount of $100,000 per occurrence and $300,000 per annual aggregate ..., hereinafter known as "basic coverage insurance" and they shall be *entitled to participate* in the fund ....

(d) There is hereby created a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider *entitled to participate* in the fund as a consequence of any claim for professional liability brought against such health care provider as a defendant ... to the extent such health care provider's share exceeds his basic coverage insurance.... The limit of liability of the fund shall be $1,000,000 for each occurrence for each health care provider and $3,000,000 per annual aggregate for each health care provider.

(e)(1) The fund shall be funded by the levying of an annual surcharge on or after January 1 of every year on all health care providers *entitled to participate* in the fund. The surcharge shall be determined by the director ... and subject to prior approval by the commissioner.

(e)(3) Notwithstanding the above provisions relating to an annual surcharge, the commissioner shall have the authority, during ... September of each year thereafter, if the fund would be exhausted by the payment in full of all claims which have become final and the expenses of the office of the director, to determine and levy an emergency surcharge on all health care providers then *entitled to participate* in the fund. Such emergency surcharge shall be the appropriate percentage of the cost to each health care provider for maintenance of professional liability insurance....

40 P.S. § 1301.701 (emphasis added).

17. For example, Dr. Lynch testified that the reason he did not pay his surcharge was because he "felt it was an attack on the private practice of medicine." (N.T. 6/27/96, p. 55).